UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| 2302 N. TRUMAN ENTERTAINMENT | ) | |
| MGMT., LLC d/b/a PURE PLEASURE | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV393 HEA |
| | ) | |
| CITY OF PEVELY, MISSOURI, and | ) | |
| and Hon. JOHN KNOBLOCK, Mayor of | ) | |
| the City of Pevely Missouri, | ) | |
| | ) | |
| Respondents. | ) | |

## OPINION, MEMORANDUM AND ORDER

### Facts and Background

On October 1, 2012 the Court held a bench trial on Complainant 's

Complaint for Injunction and Declaratory Judgment and Respondents'

Counterclaim for Injunction. Previously, the Court had issued a Temporary Order.

Prior to trial, the parties stipulated to trial of the issues in two phases.  In this first

phase, the parties submit for determination the issue of whether Respondent

lawfully denied Complainant 's application for a business license and which party

is therefore entitled to injunctive and/or declaratory relief.

Prior to trial, the parties stipulated to 26 enumerated facts which comprise

most of the factual allegations of the Complaint for Declaratory Judgment and

Permanent Injunction.

The Court finds as follows:

Don Kleinhans Sr . testified that he and his son, Don Kleinhans Jr . were and are members and managers of Complainant, a Florida LLC authorized to do business in Missouri . Kleinhans acknowledged that his family owns other Limited Liability Companies that operate Adult and Sexually Oriented businesses known as "Pure Pleasure Megacenters"  which are "adult " or " sexually oriented businesses" defined by the laws of their respective states in Florida, Illinois and elsewhere Missouri .

In 2010 Kleinhans and his son, both of whom are members/managers of Complainant , decided to develop a new kind of store to be known as "Pure Pleasure Boutique," which, unlike the "Megacenter " stores, would not sell any pornography or products to cause it to be a be a " sexually oriented" or "adult " business, and which would sell , for offsite use only, lingerie, lubricants, novelties and marital aids.  By avoiding products that would render the store a "sexually oriented business,"  Complainant planned to locate in a higher customer traffic "retail" zone rather than be consigned to an "industrial " zone less conducive to retail sales.  The new store format was a response to the competition of internet pornography sales.  This witness was not involved in discussions with city

officials directly in early discussions with Respondent, rather, his son, Don Kleinhans, Jr. handled the discussions.  Kleinhans testified that after his son met with Respondent 's city manager Happy Welch in October of 2010 to determine which of Respondent 's ordinances would apply to Complainant 's contemplated store, Complainant acquired a "Lease with Purchase Option" from the owner of a commercial building known as 8600 Daniel Dunklin Blvd.  This building had been vacant since its prior occupant, a tanning salon, departed several years earlier.  The building is located in a B-2 retail zone amid banks, an auto part store, fast food restaurants and strip malls on the north side of Respondent 's Main Street. Kleinhans acknowledged that there is a church and school among the stores on the south side of Respondent 's Main Street.

Kleinhans testified that currently, only about one fifth of the store's retail area could be utilized as lack of a Business license precluded obtaining business permits necessary to "build out " (remove the old tanning bed rooms and install one retail sale display areas) in the balance of the interior.  Also, the business could not obtain from Respondent a permit to install a sign, water or sewer service.

Kleinhans testified that the store received occupancy permits from the Respondent 's building inspector and from the Dunklin Fire Department after

- 3 -

installing "panic hardware" on the rear entrance.  Kleinhans testified that
Complainant opened the small front area of the store that was available on
December 10, 2010, and has remained open on a restricted basis since that time
despite multiple citations by Respondent. He testified that one of his reasons for
keeping the store open was advice of counsel of the necessity of exercising free
speech rights.

When cross examined about the details of Complainant's use of
abbreviations in its filings with the Missouri Secretary of State, its
stated purposes for doing business, and Complainant 's registration of
the fictitious name "Pure Pleasure Boutique", Kleinhans advised
that such matters were handled by attorneys or employees for the
business.

In rebuttal testimony, Kleinhasns testified that Complainant's Application
for Business License states that Complainant is " . . .organized for the purpose
of transacting all lawful activities and businesses that may be conducted by a
limited liability company under the laws of Florida."  Complainant 's exhibit 8
demonstrates that Complainant has registered the fictitious name "Pure Pleasure
Boutique" with the Missouri Secretary of State's office.  Kleinhans was the
Complainant's only witness.

- 4 -

Respondent called its Mayor, the Honorable John Knoblock, as its first witness.  He testified that the city had "a master plan" for a "strip mall " use of the area where Complainant 's store is located which was somehow inconsistent with Complainant's store.  Mayor Knobloch could not say how Complainant 's store was inconsistent with such plan other than to say it might have something to do with location of roads.  No explanation was given as to how the business, rather than the location of the 8600 Daniel Dunklin building, would affect the location of roads.  No evidence was introduced regarding how the Complainant 's store would be inconsistent with such "master plan,"  and no such "master plan" or ordinance adopting such was introduced into evidence.  Mayor Knobloch testified that when Complainant submitted its Application for Business License on November 8, 2010, new "Sexually Oriented Business" ordinances were "in the works."  However , on cross examination, Mayor Knobloch admitted that by "in the works" he meant that city officials had only thought about or discussed passing ordinances, and that prior to Complainant 's application for license on November 8, 2010 there were no steps taken to enact such an ordinance.  Introduction of the bill, first reading, second reading and passage all occurred at a council meeting December 20, 2010, the ordinance having been " tabled" on December 6, 2010.  When Mayor Knobloch was asked by the Court why Pevely had denied

- 5 -

Complainant 's application for business license, the sole reason he cited was that as a "Sexually Oriented Business," Complainant 's store could not be located in a B-2 retail zone. When the Court inquired why he considered Complainant 's store at 8600 Daniel Dunklin in Blvd to be a "Sexually Oriented Business," Mayor Knobloch said it was because Complainant 's store was an "Adult Book Store" selling "Adult books."  When the Court inquired what Mayor Knobloch considered an "adult book,"  he stated that he did not know, and that further he had never seen what the Complainant sells, and did not know what language in the city's ordinances defined "Adult book" or "Adult Bookstore."

Mayor Knobloch testified that Respondent had " industrial zones" within the city where sexually oriented businesses could be located. Former Pevely city manager Happy Welch testified that in 2010, it was his job to be in charge of the day to day operations of the city.  He was appointed by the city council to this position which he held until sometime in 2011. He testified that none of the city's ordinances concerning "adult oriented businesses" were enacted in response to the Complainant 's application for a business license, but rather because in April of 2010, Respondent became concerned that a "dance troop" was to perform within the city. Exhibits C and D were passed in April of 2010, but Exhibit E was enacted on December 20, 2010 after Respondent had already denied

- 6 -

Complainant 's application for business license on November 18, 2010, and

imposed a moritorium on new business license applications on December 6, 2010.

Welch had no explanation as to why the city waited until after Complainant 's

application for license had been denied to commence the process of enacting

Exhibit E.

Welch testified that in October of 2010, "about a month before [they]

submitted application for business license Don Kleinhans Jr.. and Complainant 's

counsel met with him at City Hall to inquire about obtaining a business license for

the proposed store at 8600 Daniel Dunklin Drive, in a B-2 retail zone. Kleinhans

and his attorney advised Welch that the store would self-limit customers to

exclude minors and would not sell or provide any pornography.  They told Welch

they contemplated the store selling lingerie, lubricants and " sexy" novelties, but

would not sell any items which the city would prohibit to be sold in a B-2 retail

zone.  Kleinhans and his attorney asked for copies of the city ordinances defining

what type of business they could operate and what items they could or could not

sell at that location. Welch testified that he provided copies of the requested

ordinances.  He testified that he told Complainant 's representatives that regardless

of the existing ordinances, he did not believe the city would be receptive to the

Complainant 's store because the city had a "master plan,"  which he could not

- 7 -

provide, which he felt was somehow inconsistent with the use proposed by Complainant.  No such master plan was ever provided to Complainant's representatives, and no such master plan was placed into evidence.

When Welch received Complainant's application for  business license, he called the mayor and councilmen by phone to "poll " them about whether or not to grant the license.  Welch testified that they unanimously advised him to deny the license. When asked why the city denied Complainant 's application for business license, he testified that as an "Adult " or "Sexually Oriented" business, Complainant's store could not be located in a B-2 zone.  When asked what ordinance he relied upon in making that determination, Welch cited exhibit E, ordinance 1244 amending Section 210.490 of the Pevely City Code, even though this ordinance was not enacted until December 20, 2010, <u>after</u> Welch had already denied the license application.  Welch's notice to Complainant that its application for license is denied, stating in enumerated sentence # 3, that the Pevely Municipal Code *will* classify items for sale as " sexually oriented."  Welch noted that the applicable language of Exhibit E would be found in Sec. 210.490-A (2)(a), exhibit E page 3, defining a sexually oriented business as one dealing in goods for "specified sexual activities" or "depicting specified anatomical areas,"  and Sec. 210.490-A(14) and (15), exhibit E page 6, which define " specified sexual

activities" and " specified anatomical areas."  The ordinance language is based on

the definitions of the same terms in Section 573.528(16) and (18).  When asked

what he believed Complainant 's store sold that ran afoul of these ordinances,

Welch acknowledged that he really did not know, but that he thought that some

packaging might possibly have a depiction of " specified sexual activities" and

that a "butt plug" might also fit the ordinances' definitions, but could not say how.

When asked how a "butt plug" would differ from an enema device or a

suppository  Welch stated the "context of use" rather than the ordinance's

language or the nature of the object itself would determine.  When asked how the

Complainant could know what is and is not allowed under the ordinances, he

stated that would depend upon "contemporary community standards."  He could

not cite specific language of the ordinances which would give Complainant or

others notice of what is and is not allowed. When asked what language in

Complainant's application for business license caused him to conclude that

Complainant's proposed boutique would be a "Sexually Oriented Business" per

the city's ordinance, he stated that the application said the store would sell "Adult

Products."  When shown Exhibit 2,  Welch acknowledged the application actually

said " . . .adult products other *than as defined in section 405.050 of the city*

*of Pevely."*

After denying Complainant a license,  Welch notified Complainant that the city required Complainant to submit a new application for license in correspondence dated December 6, 2010.   But the same correspondence advised Complainant that the city had imposed a moratorium on new business license applications.  When asked if the city had ever notified Complainant that the "application moratorium" had been lifted,  Welch testified the city had not.

Respondent 's Exhibit K is a transcript of Respondent 's city council meeting of December 19, 2011 when Respondent conducted a hearing on Complainant' s application for business license  pursuant to this Court's Opinion, Memorandum and Order of December 2, 2011.  This transcript indicates that the only evidence presented to the council as to whether Complainant's Application for License contemplated, or the Complainant's operation of its store during the preceding year demonstrated, sales prohibited in a B-2 zone was in the negative. Most all such evidence of compliance with ordinances came from Complainant's witnesses who stated that Complainant sold only lingerie, lubricants and novelties, with no pornography or depiction of sexual anatomy or activity. All products were sold for use offsite.

Various individuals making public comment said they wanted the store gone, but the only individual who actually went into the store to see what was

being sold was Ms. Elise Moloney, who stated, " . . .And I did go in there just to see what they sold. . .Just saying all they had was nighties and lotions and a few sexual toys. . . "  Respondent 's council then met in closed session, thereby depriving both this Court, and the general public, of the council's reasoning in reaching its decision.

## Discussion

Plaintiff, 2302 N. Truman Entertainment Mgmt., LLC, filed this action under the First, Fifth and Fourteenth Amendments to the United States Constitution, as well as 28 U.S.C. §§1331 and 1343,  and 42 U.S.C. §§1983 and 1988. Complainant sought to operate a retail business named "Pure Pleasure," at 8600 Daniel Dunklin Blvd., Pevely, Missouri, after significant research into a location to operate such a business.  After locating the subject property, Complainant initiated communications with City of Pevely officials and soon learned that the City officials opposed Complainant s proposed business, even though representations were made that the business would not violate any aspect of the City's zoning restrictions, and would not be "adult oriented" per Respondent's ordinances.  One of the first explanations given by City Officials for opposing the business was that the subject property was located within a larger development project that was presumably moving forward and that the City

"preferred" that "Pure Pleasure" not be established at the subject location. After a significant passage of time, there was no sign of any "larger development project," so Complainant secured the property as described below.

On October 15, 2010, Complainant executed a "lease purchase option" for the property in the names of 2302 N. Truman Entertainment Mgmt., LLC, and Don Kleinhans, personally.  In October of 2010 Don Kleinhans Jr. met with the city manager and Building Commissioner for the City of Pevely. During this meeting, it was explained in detail that Complainant 's proposed "mixed" retail use planned for the subject property in Pevely would not sell "adult oriented" magazines, videos, or any sexually explicit media, unlike the "Pure Pleasure Megacenter" retail facilities in other areas, would not sell anything to cause it to be an "Adult Oriented Business" for purposes of zoning or otherwise in the City of Pevely.

Also during the meeting, the attendees reviewed the City Code to verify what definitions and limitations would be applicable to the proposed use, again explaining in detail that Complainant's use would not include the sale of any items identified in the City Code as "adult products."  Counsel requested Welch to provide copies of all City of Pevely legislation applicable to the proposed use, which he did.

At the conclusion of the meeting, it was determined that the next step would

be to submit the City of Pevely 2010 Application for Merchants License, and, on November 8, 2010, Complainant submitted the City of Pevely 2010 Application for Merchants License in the name of 2302 N. Truman, Ent. Mgmt., LLC, to be located at 8600 Daniel Duncan (sic) Blvd. Clearly written on the application, under, "Description of Sales and/or Service at this location," Complainant wrote, " Retail Sales, Apparel Shop, Variety Store, Gift Shop including Adult Products *other* than as defined in section 405.050 of the City of Pevely." (Emphasis added). Attached to that same application was Complainant's Corporation or LLC Registration No. of the Florida Secretary of State: FL0636796, and the proper documentation establishing the Plaintiff Florida LLC was properly authorized to conduct business in Missouri.

Complainant described the site for operation as a pure retail facility selling NON- ADULT, non-sexually explicit, movies (in various formats, DVD, etc.), books, and magazines-which its patrons will view or read off-site, e.g., the privacy of their own homes.  Complainant also intended to sell various novelties and personal devices not depicting any specific "anatomical area."

On November 18, 2010, Plaintiff received a letter from Welch stating, that upon review, the license had been denied "without prejudice," stating the following bases for denial:

1) The area at 8600 Daniel Dunklin Blvd is zoned B-2 High Density Business District and does not allow adult oriented businesses.

2) AOB's are allowed in the 1-1 Light Industrial District.

3) Items for sale as defined in Section 210.490 Pevely Municipal Code will classify the use as an adult/sexually oriented business as provided in section 573.528 (1) & (15) RSMo. More than thirty percent of sales qualifies as a sexually oriented business as defined in Section 67.2540RSMo.

4) Section 573.531 RSMo. does not allow a sexually oriented business within 1000 feet of a preexisting school, house of worship, residence, etc, nor are they allowed to be open from 12 midnight to 6 AM.

5) The City is currently devising a master plan of development for the area that involves this property and has been in discussions with the property owner. Welch returned the $40 Money Order that was originally attached.

On November 22, 2010, Complainant 's Counsel sent Welch a letter stating that Complainant's facility was ready for inspection in order to obtain the Certificate of Occupancy and to have the water turned on. The letter also stated that Complainant disagreed with the bases asserted for the license denial, and stated:  "...there is obviously some confusion and/or misunderstanding. We are aware that the store is located in a B-2 High Density Business District. However,

although we intend to self limit our customers to those over the age of 18 only, our store in fact is a boutique and is not an adult oriented businesses defined by either City of Pevely ordinance or Missouri State Law. Specifically, the store will not be selling any adult oriented "material" as defined by Section 210.490. My clients will not be a "sexually oriented business" as defined by Section 67.2540 Revised Statutes of Missouri as it will not be an "adult bookstore" or an "adult video store" (and will not be selling any adult oriented books, magazines, periodicals, other printed materials, or photographs, films, motion pictures, video cassettes, compact disc, digital video disks, slides, or other visual representations of the sexual nature nor will my client store be an adult cabaret, and adult motion picture or a semi nude model studio or sexual encounter center as defined by Section 573.528.). Basically, my client's store will be selling lingerie, underwear, and novelties and none of the novelties will visually depict any part of the human anatomy. Perhaps the city's errors [are] based upon the fact the city has not inspected the store and does not know what is actually for sale there."  The letter returned the application and the filing fee, and closed with a demand that the license be issued.

On November 24, 2010, Welch appeared in the early morning and informed Complainant that the application for water service had been denied and that the

application and deposit were being returned. In response to Complainant's
inquiries as to what grounds supported the denial of water service, Welch stated
that said utilities were denied because the location did not have a business license.
Welch said he was also refusing water and sewer service to the property
due to his concern that Complainant would interpret that to be approval to open.

Later on November 24th 2010, the subject facility was visited by
building official Ken Graves who stated that he was there for an "unofficial
inspection," stated that the reason the water could not be turned on was due to the
building being deemed by the City to be an "unoccupied structure."  Graves
inspected the building and mentioned he "did not see any violations," with the sole
request being the installation on the back door of "panic hardware."  After
cooperatively discussing Complainant 's request for a fire inspection,  Graves
stated that "the City needs a better explanation of what we are really trying to do
here."

On November 24, 2010, Complainant applied for a sign permit that
was denied days later. The city inspector stated the sign application for permit was
denied based on the direction of Happy Welch.  Also, on November 24, 2010,
Complainant attended the Pevely Fire Station and set an appointment with the Fire
Marshal to come and inspect for Monday, November 29, 2010, at 10:00 a.m.

Further, on November 24, 2010,  Welch wrote Complainant's Counsel to request that Complainant submit a new application to clarify the listed uses and exceptions and also stated that Complainant would be strictly held to the listed uses as submitted on the application, that anything any different would nullify a merchants' license.  He also stated that, until said new application was submitted and approved, neither an occupancy inspection nor water "turn on" would be effected.

On November 29, 2010, the Fire Marshal inspected the property and stated that "all looked good for approval"

Complainant's Counsel wrote Welch, requesting the minutes of the Mayor and Board of Alderman's November 18, 2010, meeting at which they decided to refuse Complainant 's application.  Counsel also stated in the same letter that Complainant wished to appeal the decision. Complainant also requested that the City turn the water on and noticed the City that Complainant was incurring damages by its actions.

On November 30, 2010, Complainant  picked up the approved Certificate of Occupancy from the Fire Department and posted it on the premises behind the clerk's counter.

Complainant opened "Pure Pleasure Boutique Pevely," and placed a

temporary sign banner over the existing backlit post sign on the premises.

On December 3, 2010, agents for the City of Pevely arrived on the property and posted a Notice of Violation on the front door, while television station Fox 2 News was filming on premise, not on the basis of any request from Complainant.  The Violation was delivered by Happy Welch and a building official. The News clearly showed the City employees entering the store and delivering the notices. The notice stated that the store had to close prior to Saturday December 4, 2010.

On December 4, 2010, agents of Respondent arrived at the property and wrote the store two additional citations, one for operating for a business without a license and one for not getting a sign permit. These agents stated that they would be back *daily* with more citations if Complainant continued to stay open.  The issuance of citations has been continuing.

Complainant received a certified letter on December 6, 2010, stating that, based on Respondent's attorney's review, Complainant was not properly registered to do business in the State of Missouri and, as a consequence, the application must be denied without prejudice and that Complainant needed to submit another application. This opinion was erroneous.  The letter also stated that any new license applications would now be "held in abeyance" following a moratorium

approved by the Pevely Board of Alderman, at a meeting held December 6, 2010.

The gravamen of the "moratorium" was that no business licenses would be issued

pending amendments of Section 210.490 and Chapter 605 of the Pevely Code of

Ordinances. The letter concluded with a threat that Complainant 's continued

failure to abide by the Pevely City Code would be considered in any future

application submitted.

     Prior to opening its Facility, Complainant spent considerable amounts

of money in order to prepare the site for operation.  In making the expenditures

necessary to operate the facility, Complainant relied upon the City of Pevely's

existing ordinances and specifically, the absence of any restriction on the

proposed, explained business format.

     At the time it opened, Complainant was in conformance and compliance

with all applicable state and Pevely legislation.

After successfully restraining and denying Complainant the necessary

City licenses and approvals for completing " buildout " and operation

of the Plaintiff's business, on December 20, 2011, the City adopted ordinance

1244, an ordinance amending the City Code, referencing Section 573.540

RSMo., in a "Whereas" clause, stating, "Section 573.540 RSMo... authorized

the passage by local ordinance of adopting provisions which may be *stricter, but*

*not inconsistent with* the state statutes concerning sexually oriented businesses."

Ordinance 1244 contains a "Purpose and Findings," and also, in Sec. 210.490-A,

"Definitions," including the following relevant definitions:

(1) "Explicit sexual material" means;

(a) Any picture, photograph, or other pictorial representations, that depicts actual

or simulated "specified sexual activities"; or

(b) Any portion of a book, magazine, newspaper or other printed or written

material; or any video tape, DVD, or any other recorded medium whose content is

made up in whole or in dominant part of depictions or descriptions of "specified

sexual activities" or "specified anatomical areas."

(2) "Sexually oriented business" means any business enterprise that;

(a) Has as a regular and substantial business purpose the sale, display or rental of

goods that are designed for use in connection with "specified sexual activities," or

that emphasize matters depicting, describing or relating to "specified sexual

activities" or "specified anatomical areas"; or

(b) The definition of "Sexually oriented business" also includes, but is not limited

to, any of the following as defined herein:

(I) "Adult retail establishments" means an establishment that has as a regular and

substantial business purpose, offers for sale or rent, any one or more of the

following: instruments, gifts or paraphernalia that are designed for or used in connection with "specified sexual activities" or clothing that graphically depicts "specified anatomical areas" or any materials, such as printed materials, photographs, slides, films, videotapes or DVD, sold or rented in an adult bookstore, adult news rack, or adult news stand that are characterized by their emphasis on material depicting or describing or relating to "specified sexual activities" or "specified anatomical areas."

(16) "Substantial business purpose" means 1) ten percent (10%) or more of the gross floor area is devoted to that purpose; or 2) ten percent (10%) or more of the retail floor space is devoted to that purpose; or 3) ten percent (10%) or more of the gross sales of the business are derived from that purpose.

The other provisions of the ordinance restrict "displaying of explicit sexual materials generally (Sec. 210.490-B); License required for sexually oriented business (Sec.210.490-C); License required for managers, servers and entertainers (Sec. 210.490-D); License application: owners, servers, entertainers or managers (Sec. 210.490-E); Application processing (Sec. 210.490-F); Standards of conduct (Sec. 210.490-G); Ventilation and sanitation requirements (Sec. 210.490-H); Performances; closed rooms or booths prohibited, when... (Sec.210.490-1); License Posting, Revocation, when...(Sec. 210.490-J); Signs required (Sec.

210.490- K); and, finally, in Section III, the elimination of signs for "sexually oriented businesses," proscribed by Section 210.490 of the city Code.

The timing of the adoption of Ordinance 1244 strongly suggests that it was adopted by Respondent to restrain and prevent the operation of Complainant business.

After this action was filed, this Court heard oral argument on Complainant's Motion for Temporary Restraining Order and Preliminary Injunction, and, on December 2, 2011, this Court issued its Opinion, Memorandum and Order identifying the relevant facts, points and authorities raised thus far, and, made the following findings as it pertained to the facts established by the parties: "In the instant case, in order for Plaintiff to legitimately operate its business at the current location, it must obtain a merchant's license. The ordinance provides no time boundaries within which the City must act on the application, nor does it set out the perimeters(sic) of how the City determines whether to issue the license. It appears to the Court that, despite Plaintiffs detailing of the products which it sells, the City has determined, in its unbridled discretion, that the types of items for sale constitute "adult oriented" materials such that the sale of these items within this district is prohibited.  Plaintiffs were not heard on the issue, nor were they given the opportunity to educate the City as to the manner and scope of the merchandise,

for example, that the sale of items is strictly for patrons off the premises, that no adult films will be shown on the premises, so as to establish that the governmental interest of any harmful secondary effects of the business may be nonexistent. Because of the ordinance's failure to allow any type of hearing to determine whether Plaintiffs activities may be legally curtailed, the City is indeed vested with unbridled discretion to deprive Plaintiff of its constitutional rights. Plaintiff is entitled to a hearing to determine whether, and to what extent it may operate the business at its chosen location."

This Court ordered the City to give the Complainant a hearing, to give the City a chance to show it had the willingness to administer Complainant's application in a constitutional manner.

On December 19, 2011, the City held a "Hearing for Application for Merchants License."  The conduct of this hearing involved the customary introductions, and Counsel for Complainant's description of this Court's Order, opining that this Court found that the City had "exercised unbridled discretion" in its prior dealings with Complainant.  Counsel also explained that it was Complainant's desire, "to be a valuable corporate citizen in the community," and that Complainant "does not run a sexually-oriented business.  Nothing that he [sic] does meets the definition under the state code..."  Counsel went into a description

- 23 -

of the history of adult regulations and a polite "critique" of the City's conduct, and went in depth in showing how the Complainant's operation did not meet the definitions of "adult business," and emphasized that, while the state regulations held the "adult related media" threshold at 30%, the City's Ordinance 1244 imposed a 10% "adult related media" threshold.

In response, Respondent's Counsel described the history of the City's and state's legislation, and his view of the history between the parties to this action and, at the conclusion of the attorneys' presentations, the Mayor erroneously opined that the state statute established a "zero threshold" for "adult media."  The mayor was disabused of this misperception by both Counsel.  The operative state and City definitions are set forth below.

The definitions of "sexually oriented business" and "sexually oriented materials" in Sec. 62.2540, RSMo, state as follows:

"(7) 'Sexually Oriented business,' an adult cabaret or any business which offers its patrons goods of which a substantial or significant portion are sexually oriented material. It shall be presumed that a business that derives 30% or less of its revenue from sexually oriented materials is presumed not to be a sexually oriented business. No building, premises, structure, or other facility that contains any sexually oriented business shall contain any other kind of sexually oriented

- 24 -

business;"

(8) "Sexually oriented materials, any pictorial or three-dimensional material, or film, motion picture, DVD, video cassette, or similar photographic reproduction, that depicts nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, as defined in section 573.010."

Contrary and inconsistent with the more precise application of Section573.540 RSMo, which did authorize the passage by local ordinance of adopting provisions which may be *stricter, but not inconsistent with* the state statutes concerning sexually oriented businesses, there is no meaningful or defined limit on what might be to the definitions set forth in the state statutes, the City of Pevely has chosen to utilize an entirely different and much more vague and expansive set of definitions. Sec. 210.490-A, of Ordinance 1244, set forth above, restated for comparison:

"(2) 'Sexually oriented business' means any business enterprise that:

"(a) Has as a regular and substantial business purpose the sale, display or rental of goods that are designed for use in connection with 'specified sexual activities,' or 'specified anatomical areas,"

"(c) The definition of 'Sexually oriented business' also includes, *but is not limited to,* any and all of the following as defined herein;

- 25 -

"(1) 'Adult retail establishments' use establishment that has as a regular and substantial business purpose, offers for sale or rent, any one or more of the following: instruments, devices, gifts, or paraphernalia that are designed for use in connection with 'specified sexual activities' or clothing that graphically depicts 'specified anatomical areas' or any materials, such as print materials, photographs, slides, films, videotapes or DVD, sold or rented in an adult bookstore, adult newsrack, or adult newsstand that are characterized by their emphasis on matters depicting, describing or relating to 'specified sexual activities or 'specified anatomical areas'."

Complainant's Merchant License hearing was opened as a Public Hearing, and a variety of speakers expressed discontent with what they presumed to be the content of the materials to be sold (for off premises use only) from the store, and anecdotal stories about pornography addiction, the City's "image," and the customary objections to "adult media."

Also speaking was James Kleinhans, a member of Complainant, who explained, "for the record, and I just want to clarify that there is no porn."

After the conclusion of the Public Hearing, the following events transpired: "Mayor Knobloch: ...I just want to-- and then I believe we've heard the facts, the opinions of the public hearing here. We've heard from the Pure Pleasure group,

from the city attorney, and now we've heard some comments from citizens from

the area. As of the board, I will ask you to take all that into consideration, and to

turn this meeting now we've got to move into a couple of other hearings. So I

thank you all for being here for this here hearing. If you want to stick around,

we've got a budget hearing, a site plan change hearing, and then we'll go into our

regular meeting. Thank you all.

"Mr. Lirot: Mr. Mayor, your respectfully requested timeframe? Are you going to

issue a decision or-

"Mayor Knobloch: I got a merchants license showing here on our agenda later

where the board can either approve, they can deny, or they can table.

"Mr. Lirot: Very good. Thank you. Thank you for the approval.

"Mayor Knobloch: So tonight they'll either, if you don't want to stay, and the

attorney can get a hold of you and let you know whether they approve,

deny, or table it to a different date for consideration.

"Mr. Lirot: Will that be today?

"Mayor Knobloch: They will make that decision whether to do it. If they decide

to table and move it, then you'll be told what the date would be that they would

have that for consideration-

"Mr. Lirot: Very good.

- 27 -

"Mayor Knobloch: --for a vote..

"Mr. Lirot: Thank you much for the opportunity.

 "Mayor Knobloch: That will be up to the Board.

"Mr. Lirot: Thank you, everyone.

The decision was made to deny the application behind closed doors, and

there was no basis given for the denial; no findings of fact, and no conclusions of

law.   Thereafter, informal discussions were held between Counsel,

and mediation was conducted , however, no informal resolution was

reached.

The acts, practices and jurisdiction of Respondent as set forth herein,

were and are being performed under color of state law and therefore constitute

state action within the meaning of the Fourteenth Amendment to the

Constitution of the United States and 42 U.S.C. § 1983.

The Complainant has asserted the following Counts against the

City of Pevely: COUNT I (Prior Restraint- Refusal to Issue License);COUNT II

(Moratorium -First Amendment Violation); COUNT III *(No* Procedural

Safeguards- Refusal to Issue License); COUNT IV (Content Based Censorial

Motive); COUNT V (Unbridled Administrative Discretion); COUNT VI

(Violation of Due Process Rights); COUNT VII (Violation of Plaintiffs Equal

Protection Rights);

FIRST AMENDMENT JURISPRUDENCE

Complainant believes that the making available for sale and distribution the various media and items that the City apparently has either misconstrued or simply does not approve of is a lawful and constitutionally protected expression of ideas. Complainant has applied for, and been denied, twice, a Merchants License, first arbitrarily, which precipitated the filing of this lawsuit, and then, second,  the rejection of the appeal of the license denial was done behind closed doors on December 19, 2011.  In the context of the First Amendment, the Supreme Court has "long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755-56 (1988); *Clark v. City of Lakewood,* 259 F.3d 996, 1009 (9th Cir. 2001).  "A licensing scheme, adult or otherwise, can vest 'unbridled discretion' in a decisionmaker where the scheme fails to place limits upon when a decisionmaker must make a determination." *Clark,* 259 F.3d at 1009.  In this Court's earlier Order, it is clear that this Court recognized that the City had exercised "unbridled administrative discretion."

- 29 -

Based on the facts elucidated in the Complaint in this action, there can be no question that the City continues to believe that it possesses "unbridled discretion" whether or not to issue merchant licenses, or any other municipal entitlements necessary to conduct business within the City.  The City has exemplified the imposition of the "prior restraint" found repugnant in our constitutional form of law.  Additionally, since the issue and threat of a moratorium was injected into this controversy, this Court should be guided by the example of other district courts considering the issue of moratoria, which have consistently applied a prior restraint analysis to moratoria prohibiting the issuance of adult entertainment licenses. *E.g., Howard v. City of Jacksonville,* 109 F. Supp. 2d 1360, 1363 (M.D. Fla. 2000); *D 'Ambra v. City of Providence,* 21 F. Supp. 2d 106, 111-12 (D.R.I. 1998); see also *Clark,* 259 F.3d at 1005 ("A licensing scheme regulating nude dancing is considered a prior restraint because the enjoyment of protected expression is contingent upon the approval of government officials."). (Citations omitted). A prior restraint stops protected speech before it starts.  See *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 553 (1975) (defining a prior restraint as giving "public officials the power to deny use of a forum in advance of actual expression").  It is well settled that the First Amendment protects even the "right to open and operate an adult theater featuring topless,

- 30 -

exotic or nude dancing." *Schad v.Borough of lvfount Ephraim,* 452 U.S. 61, 65

(1981)).  Since the law protects these more "intensive and explicit" forms of

speech, it must surely protect the *non-adult* speech and products offered by the

Complainant.  " Prior restraints bear a ''heavy presumption" against constitutional

validity because they pose a significant threat to free speech. *E.g., Freedman v.*

*lvfmJJ/and,* 380 U.S. 51, 57 (1965).  To survive a constitutional challenge, any

licensing scheme must contain at least two procedural safeguards: (1) a specified

and reasonably prompt time frame to issue or deny the license, and (2) the

possibility of judicial review in the event the license is erroneously denied. See

also *Clark,* 259 F.3d at 1005.

In this case, Respondent  not only fails to provide a specified time for

rendering a licensing decision in its licensing regulations, but it has now gone a

step further in suppressing protected speech and prohibiting any new

"controversial" businesses from opening.  As a result of the City's conduct, no new

"controversial" business can hope to get a license.  Other district courts that have

considered similar moratoria on issuing *even Adult Use licenses* have held that

significantly smaller time periods preventing the opening of new adult cabarets are

unconstitutional. *Howard and Emro v. City of Jacksonville,* 109 F.Supp.2d 1360,

1364 (M.D.Fla. 2000) (holding 120-day moratorium on issuing adult cabaret

licenses coupled with 45- day review period is unconstitutional); *D'Ambra v. City of Providence,* 21 F.Supp.2d 106, 113 (D.R.I. 1998) (holding 18-month moratorium on issuing adult cabaret licenses is unconstitutional). It is clear that the City's actions are unconstitutional, particularly since they are not based on any actual showing that Plaintiff will operate any "adult use." For the City to base its actions on the fear and innuendo it has injected into the facts by determining the Complainant's business is somehow not to be allowed, that further supports the relief requested by Complainant.

Respondent's current licensing scheme is unconstitutional because, by failing to specify a reasonable time frame for issuing a licensing decision, as made clear by the manner of dealing with the merchants license in the December 19, 2011, hearing.

As this Court recognized in its prior Order, Governments cannot unilaterally choose to regulate such expression by any procedures they want, regardless of the impact on the constitutional protections involved. *Simon & Schuster, Inc. v. New York Crime Victims Board,*502 U.S. 105 (1991); *Stanford v. Texas,* 379 U.S. 476, 484-485 (1964); *A Quantity of Books v. State of Kansas,* 398 U.S. 205, 212 (1964); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 65-66 (1963).

Regulations of constitutionally protected speech can only be validated as

reasonable time, place and manner restrictions if they are "designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 50 (1986); *United States* v. *0'Brien,* 391 U.S. 367(1968).  Such restrictions must be "unrelated to the suppression of free expression," must place no more than "incidental" burdens on protected expression, and must further the governmental interest asserted. *0'Brien, supra.* A requirement of this concept is that these adverse secondary effects be established through competent, substantial evidence. *Krueger v. City of Pensacola,* 759 F.2d 851 (11th Cir. 1985).  The adverse secondary effects sought to be remedied must be a "legitimate state interest" and the legislation must work in a way that is rationally related to the control of any alleged problem. Facial challenges to this type of legislation are the proper method to resolve these issues. See *Dombrowski v. Pfister,* 380 U.S. 479 (1965).  Indeed, while sexually oriented media may not be deemed worthy of protection by many, it is the character of the right, not of the limitation, which determines the level of scrutiny to be given the review of any legislation impinging a First Amendment right. See *Thomas v. Collins,* 323 U.S. 819 (1945).

Local governments cannot unilaterally attempt to prevent a business activity simply because they purport to be offended by the type of media offered therein,

or are operating under the misguided belief that ridding a municipality of forms of speech deemed objectionable by some citizens is a laudable or justifiable goal. Such activities have clearly been viewed by the courts as the imposition of unconstitutional prior restraints, and have been sharply criticized in every instance where they have been reviewed. See *City of Paducah v. Investment Entertainment, Inc.*, 791 F.2d 463,468-70 (6111 Cir. 1986); *Kristei, Inc. v. City ofOklahoma City*, 572 F.Supp. 88 (W.D. Ok 1983).  Since the City of Pevely has shown that its only intent in preventing Complainant's business is "content based," Complainant is entitled to a judgment on these issues.

 TAKE-HOME ONLY BUSINESSES DO NOT CAUSE SECONDARY EFFECTS AND THE CITY HAS NOT SHOWN ANY EVIDENCE THAT COMPLAINANT'S OPERATION EVEN EXCEEDS THE 10% "ADULT MEDIA" THRESHOLD IMPOSED BY CITY ORDINANCE 1244

Complainant proposes to operate a business that simply provides for the retail sale of non-adult materials, but the City has taken the position that it either does not believe the Complainant's representatives or it finds any even remotely "sexual suggestiveness" repugnant. The definitions of what is or is not "adult material" are clear, and Complainant agreed to abide by these definitions;  the City still has acted in an unconstitutional manner in the way it has simply withheld

- 34 -

licenses for pretextual purposes. One fact is clear: there will be no on-premises "consumption" or viewing of adult fare either by the presentation of live dance performances or by customers being able to view adult material in preview booths or in a theater-like setting. Both the law and planning literature are clear, even assuming *arguendo* that sexually-oriented Adult Uses cause unusual "adverse secondary effects," there is no evidence that "take-home only" businesses cause such effects.

In *Richardson v. Wile,* 535 A.2d 1346 (Del. 1987), (presumably an early example of the influence of video tape on the adult entertainment industry), the Court held (on certification from the United States District Court for the District of Delaware):

> There is no suggestion in section 1601, nor are we aware of any other legislative declaration, that video rental stores purveying a broad array of movie material present any special problem of safety or law enforcement.
>
> Of primary significance are the examples of "adult entertainment establishments" cited in section 1602.  Included on this list are: adult book stores; conversation parlors; adult peep shows; adult motion picture theatres; and massage establishments. Although, as the text of the statute makes clear, this list is not meant to be exclusive, the cited examples are distinct from video rental stores in that they involve on-site displays of sexually oriented materials or sexual activities. In contrast, video rental stores generally offer videos for home use and do not include the on-site element that Chapter 16 seems to contemplate. We find the site/activity nexus a significant

- 35 -

indication, ...

As noted, these examples [of regulated Adult Uses] encompass on site activities which would be likely to promote the crimes of obscenity and prostitution. In contrast, a video rental store which rents movies for home use does not generate the same concerns.

In *World Wide Video v. City of Tukwila,* 816 P.2d 18 WA. 1991), the

Court noted:

"In contrast, Tukwila has not shown that adult businesses with

predominantly 'take home' merchandise (which clearly are covered by the

ordinance) have the same harmful secondary effects traditionally associated with

adult movie theaters and peep shows; thus the 'substantial governmental

interest' portion of the test has not been met."

More recently, in the first of the *Encore Video* decisions, infra, the most

thorough discussion of "take home" only stores dealing with adult materials, the

Court wrote:

The studies [in the San Antonio record, relatively typical of most local government's "predicates"] either entirely exclude establishments that provide only take-home videos and books (as is the case with the Seattle study)  or include them but do not differentiate the data collected from such businesses from evidence collected from enterprises that provide onsite adult entertainment- as may have been tl1e case with the Austin and Garden Grove studies. Offsite businesses differ from onsite ones, because it is only reasonable to assume that the former are less likely to create harmful secondary effects because of the fact that consumers of pornography are not as likely to linger in the area and engage in public alcohol consumption and other undesirable activities.

- 36 -

The question whether the kind of studies relied on by the city constitute adequate proof is one that has divided federal circuit courts and state supreme courts. The Eighth and Tenth Circuits have endorsed the position advocated by the city here. By contrast, the supreme courts of Washington and Delaware have taken positions similar to Encore Videos'.

"The reasoning of the Washington Supreme Court is persuasive. It points out that the ordinance at issue - which placed restrictions on all video stores whose inventory consisted of ten percent or more adult materials-is broad enough to "include 'mainstream' video stores that have restricted adult sections." *World Wide Video,* 816 P. 2d at 21. Ordinance #87443 is only slightly less extreme: It restricts the location of any bookstore or video store "where more than 20% of its inventory" consists of adult materials. San Antonio Ordinance #87443 §§ 1( 2).

"The Washington court based its decision on the fact that none of the studies cited by the city gave separate consideration to the effects of businesses that have such a small proportion of adult materials in their inventory. *World Wide Video,* 816 P. 2d at 21. That court viewed, as problematic, the inclusion of enterprises with a low percentage of pornographic material in their inventory, because many, if not most, of those enterprises offer the objectionable material only for offsite use, and there is no proof that this causes secondary effects. "[ The city] has not shown that adult businesses with predominantly 'take-home' merchandise(which clearly are [sic] covered by the ordinance) have the same harmful secondary effects traditionally associated with adult movie theaters and peep shows ...." *Id.*

Given the potentially sweeping implications of the ordinances in *World Wide Video* and the instant case, we must require at least some substantial evidence of the secondary effects of establishments that sell adult products solely for offsite consumption. Otherwise, even ordinary bookstores and video stores with adult sections could be subjected to regulation that restricts their First Amendment rights without evidence that they cause "secondary effects."

Such a state of affairs surely conflicts with the requirement that government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward,* 491 U. S. at 799. It also conflicts with the minimal requirement accepted by Justice Kennedy and the

four dissenters in *Alameda Books:* that the burden on speech imposed by a secondary effects ordinance be "no greater than necessary to further th[e city's] interest" in combating secondary effects. *Alameda Books,* 122 S.Ct. at 1749 n. 8 (Souter, J., dissenting). [Footnote Omitted].

"Under *Alameda Books,* therefore, the city, to meet its burden, must provide at least some evidence of secondary effects specific to adult businesses that sell books or videos solely for off-site entertainment. Because there is no such evidence in the record, we must strike down the zoning provision of Ordinance #87443.

*Encore Videos v. City of San Antonio,* 310 F.3d 812 (5th Cir. 2002), modified on

denial of petition for rehearing, at *Encore Videos v. City of San Antonio,* 330 F.2d

288 (5 1Cir. 2003). (footnotes omitted).

In its final opinion in this series of decisions, *Encore Videos* (330 F.2d 288),

the Fifth Circuit deleted the harsher criticisms of *ILQ* and *Z. J. Gifts,* but still

refused to follow their reasoning.

In *DiMa, Inc. v. High Forest Township,* 2003 WL 21909571 (D. Minn.

2003):

"Here, under the standard set forth in *Alameda Books,* the Court finds that genuine issues of fact exist as to whether High Forest Township was reasonable in relying upon the studies that provided the rationale for its ordinance. Primarily, the Court finds persuasive that the studies relied upon by High Forest Township were conducted in metropolitan, not rural, areas, and the studies did not particularly examine the secondary effects of purely take- home fare. In addition, some of the studies were more than 25 years old. While these factors alone may not be enough to overcome the mere rationality test of *ILQ,* the conflicting studies presented by DiMa have certainly cast doubt on whether the studies relied upon by High Forest Township are applicable or valid. Under *Alameda Books,* this is

- 38 -

sufficient to shift the burden back to High Forest Township to further justify its rationale."

Although not entirely clear from the record, the City has provided miscellaneous "research materials" that opine negatively on "adult entertainment. These include materials from a *"Hearing on the Brain Science behind Pornography  Addiction and the Effects of Addiction on Families and Communities,"* Presented to the Senate Committee on Commerce, Science, and Transportation, the Subcommittee on Science, Technology, and Space, dated November 18, 2004. These materials boldly profess alleged adversities attributed to the consumption of "adult media" and what the authors asserted viewing such "content" may do to the human mind. Not only are these materials not a "valid legislative predicate," they make no mention of any legally cognizable "adverse secondary effect," and they take the exact same governmental approach found unconstitutional in *U.S. v Playboy Entertainment Group,* 529 U.S. 803 (2000):

"Our precedents teach these principles. Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities "simply by averting *[our]* eyes." Cohen v. California, 403 U.S. 15, 21 (1971); accord, *Erznoznik v. Jacksonville*, 422 U.S. 205, 210 211 (1975). Here, of course, we consider images transmitted to some homes where they are not wanted and where parents often are not present to give immediate guidance. Cable television, like broadcast media, presents unique problems, which inform our assessment of the interests at stake, and which may justify restrictions that would be unacceptable in other

contexts. See *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC*,
518 U.S. 727, 744 (1996) (plurality opinion); id., at 804 805 (Kennedy, J.,
concurring in part, concurring in judgment in part, and dissenting in part); *FCC v.
Pacifica  Foundation*, 438 U.S. 726 (1978). No one suggests the Government must
be indifferent to unwanted, indecent speech that comes into the home without
parental consent. The speech here, all agree, is protected speech; and the question
is what standard the Government must meet in order to restrict it. As we
consider a content-based regulation, the answer should be clear: The
standard is strict scrutiny. This case involves speech alone; and even where
speech is indecent and enters the home, the objective of shielding
children does not suffice to support a blanket ban if the protection can be
accomplished by a less restrictive alternative." *Id.*

None of the materials that might be even remotely relied on by the City to

support Ordinance 1244 discuss, in any fashion, the "Pure Pleasure" business

model, the off-premises only vending of materials that do not exceed even the

10% threshold of matter "describing or depicting specified anatomical areas or

specified sexual activities."  The City's ad hoc reliance on the state statute that was

upheld in *Ocello v. Koster* (Mo., 2011).  While it would appear simply logical to

find that a state statute that allows for a 30% threshold of "adult media" before

finding a business to be an actual "adult entertainment business" subject to

differential regulation, is violated by a City ordinance, like Ordinance 1244, that

imposes a 10% threshold, when the state statute can be interpreted as not allowing

such a restriction. The City adopted ordinance 1244, an ordinance amending the

City Code, referencing Section 573.540RSMo., in a "Whereas" clause, stating,

"Section 573.540 RSMo... authorized the passage by local ordinance of adopting provisions which may be stricter, but not inconsistent with the state statutes concerning sexually oriented businesses."  Under any analysis, a 10% threshold is stricter, but clearly inconsistent with a 30% threshold.

Critically, under the basic due process considerations in free speech regulations, "merely mimicking" an ordinance upheld elsewhere is not enough. See *Basiardanes v. City of Galveston,* 682 F2d 1203, 1213 (5th Cir. 1982). Every piece of legislation requires the Court:

"...To examine the strength and legitimacy of the governmental interest behind the ordinances and the precision with which the ordinance is drawn. Unless the ordinance *advances* significant governmental interests and *accomplishes* such advancement without undue restraint of speech, the ordinance is invalid." *Basiardanes* at 1214, citing *Schad v. Borough ofMt. Ephraim,* 101 S.Ct. at 2183-2184. (Emphasis added).

Common sense would indicate that such differences would advise against expedient comparisons, but case law also supports reasoned distinctions. As identified by Justice Souter in the *Alameda Books* decision, there is both a reliable and "just" method to "test the hypothesis" of whether or not "adult uses," or whether specific *types* of adult uses, cause secondary effects. See *Encore Videos,*

- 41 -

*Inc. v. City of Antonio,* 330 F. 3d 288 (5th  Cir. 2003) and *Erotique Shop Inc. v.*

*City of Grand Prairie,* 2006 U.S. Dist. Lexis 85992 (N.D. TX. 2006).  This theory

has proven to be elusive to some courts, but one of the most accurate articulations

of the evidentiary requirements establishing secondary effects as a prerequisite to

adopting adult entertainment restrictions in *Alameda Books* is set forth in *Giggles*

*World Corp.* v: *Tmvn of Wappinger,* 341 F. Supp. 2d 427 (S.D.N.Y. 2004):

"...The burden is upon Wappinger to *produce evidence in support of its belief that*

*businesses such as Giggles are likely to produce harmful secondary effects. See*

*City of Los Angeles v. Alameda Books, 535 U.S. 426, 438  (2002)* (stating that

"this is not to say that a municipality can get away with shoddy data or reasoning.

*The municipality's evidence must fairly support the municipality's rationale for*

*the ordinance.")*.  While Defendants' *motion for summary judgment may*

*demonstrate that various studies show the harmful secondary effects of adult*

*use businesses in other municipalities, Defendants still must show some*

*evidence that Giggles' business poses a risk of causing the same type of harm."*

*Id,* 341 F. Supp. 2d 427, 430-31 (S.D.N.Y. 2004), emphasis added.

Under any analysis, the City of Pevely has offered nothing to support

any type of restriction on an "off-premises" consumption only business, especially

one that does not even exceed a 10% threshold on matter "describing or depicting

specified anatomical areas or specified sexual activities," or any of the other

entirely vague and open ended definitions of Sec. Sec. 210-490-A of Ordinance

1244, and Complainant is entitled to judgment on these Issues.

D. THE TIMING OF THE ADOPTION OF ORDINANCE 1244 SHOWS THAT

IT WAS DESIGNED TO THWART PLAINTIFF'S CONSTITUTIONAL

RIGHTS AND SUCH ACTIONS ENTITLE COMPLAINANT  TO A

JUDGMENT

The exercise of prior restraint and moratorium against any business even

remotely deemed "adult" until the City could adopt Ordinance 1244 has been

exposed and rejected by every court dealing with such a scenario. See *754 Orange*

*Ave., Inc., v. City of West Haven Connecticut*, 761 F. 2d 105, (2"d Cir. 1985).

As a matter of law, a City cannot adopt an ordinance that is motivated by the

desire to suppress protected First Amendment Rights.  *Avalon Cinema C01p. v.*

*Thompson,* 667 F.2d 659, 662-663 (8th Cir. 1981). Accordingly, a Court must

consider objective evidence of the City's motivation in passing an ordinance that

suppresses Complainant's First Amendment Rights.

Laws enacted by a municipality which govern adult uses can survive a

constitutional attack **only** if, *inter alia,* the municipality can prove that the law is

*unrelated* to the suppression of protected expression, that it furthers a substantial

governmental interest, and that it is narrowly tailored to further that interest. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41(1986); *Schad v. Borough of Mount Ephriam, supra, Young v. American Mini-Theatres,* 427 U.S. 50 (1976); *Christy v. City of Ann Arbor,* 824 F.2d 489 (6th Cir. 1987); *CLR C01p., v. Hemline,* 702 F.2d 637 (6th Cir. 1983); *Keego Harbor, Inc., v. City of Keego Harbor,* 657 F.2d 94 (6th Cir. 1981); *Nforscott, Inc., v. City of Cleveland,* 781 F. Supp. 500 (N.D. Ohio 1990); *Cleveland's P.lvf. on the Boardwalk, et. al., v. City of Cleveland,* Case No. 1:92CV 1412 (N.D. Ohio 1992).  In order to overcome the **presumption** that a law is intended to suppress free expression, the burden of proof is on the municipality to demonstrate that, at the time the ordinance was enacted, the municipality was attempting to address the adverse secondary effects caused by a concentration of adult uses. *Renton, supra,* 106 S. Ct. 930-31; *Christy,* 824 F.2d at 491, 493; *CLR C01p., supra,* 702 F.2d at 639. "The burden of proof is [also] on the City to show that more than a rational relationship exists between the ordinance and this government interest." *Christy*. supra, 824 F. 2d at 493; *Keego Harbor, supra*, 657 F. 2d at 97 n.3 (Emphasis supplied).

In this case, the evidence is clear and undisputed. The City has attempted to camouflage its clear motivation to suppress Complainant 's First Amendment rights, by alleging a pretextual interest in addressing adverse secondary effects,

when, in fact, the overwhelming evidence in this case is that the subject Ordinance 1244 was enacted solely to suppress constitutionally protected expression. For this reason alone, Complainant is entitled to a judgment on these issues. As a matter of law, it is improper when a municipal entity's zoning decisions in passing an adult entertainment ordinance may have been motivated by the desire to suppress protected First Amendment expression. *Ranch House. Inc.. v. Amerson*, 238 F.3d 1273 {11th Cir. 2001); *Avalon Cinema Corp. v. Thompson,* 667 F. 2d 659, 662-663 (8th Cir. 1981); *754 Orange Ave., Inc. v. City of West Haven, Connecticut,* 761 F. 2d 105 (2nd Cir. 1985). *Covar v.* C.G. *Bill Jvfeyer,* 721 F.2d 1260 (Cir. 9th 1983); *Goldberg v. Whitman,* 743 F. Supp. 943 (U.S.D., Dist. Conn. 1990); *Kuzinich, Sr. v. C wzty of Santa Clara,* 689 F.2d 1345 (9th Cir. 1983). See also *Board of Education v. Pica,* 457 U.S. 853 (1982).

As a threshold issue, a court must first determine, "whether the state's regulation is related to suppression of expression." If the government interest is related to the content of the expression, then the regulation falls outside the scope of the *O'Brien* test, and must be justified under a more demanding test. *Hill v. Colorado,* 530 U.S. 703. In this case, the evidence establishes that the City's Ordinance 1244 was undoubtedly related to the content of the speech the City *speculated* that the Complainant *may* have sold, since Complainant unequivocally

- 45 -

stated that its operation would comply with the existing City regulations..

The cases of *Tovar v. C.D. Billmeyer, supra* and *754 Orange Ave., Inc.,* v. *City of West Haven Connecticut, supra,* are compellingly similar to the facts in the case at bar. In *Tovar,* the plaintiff brought an action challenging zoning decisions that prevented it from operating an adult theater and bookstore at a newly acquired site. The trial court granted summary judgment to the City of Pocatella. The Court of Appeals reversed the summary judgment, holding that an issue of fact existed as to whether the City of Pocatella's actions may have been motivated by the desire to suppress protected First Amendment expression.

In *Tovar,* the plaintiff operated an adult theater and bookstore for three (3) years. It sought a new location in the same zoning district, a permitted use. Before plaintiff had an opportunity to apply for permits and licenses, the City of Pocatello, after learning that plaintiff sought to relocate, held a special meeting. Plaintiff alleged that the purpose of the meeting was to prevent it from relocating. The City of Pocatella Council ordered the building inspector to deny a permit when Plaintiff applied for it.

In the case at bar, substantially similar facts gave rise to the City of Pevely's adoption of the subject Ordinance 1244, because the City delayed Complainant 's entirely lawful application, until it could wrongfully adopt a preclusive Ordinance.

- 46 -

In *Orange Avenue,* like the case at bar, the ordinance increasing the separation

distance was amended only after the City learned that *Orange* 's leased premises

was beyond the distance requirement in its existing Ordinance. In *Orange* the

Court held:

> In addition, Section 32-2.7 is impermissible as enacted
> because its adoption strongly suggests that it was aimed
> solely at *754 Orange.* Only after the City learned that
> *754 Orange* leased premises is beyond 1000 feet from
> any school. . . Did the City amend the Ordinance so as
> to include *754 Orange's* building within its scope."

*Id* at 112.

In the case at bar, it is undisputed that the City of Pevely enacted Ordinance

1244, only after it learned of the Complainant's business desires, and, after

imposing a complete prior restraint, the ordinance is still being used as a pretext to

restrain Complainant's speech rights. Thus, as a matter of law, Ordinance 1244 is

impermissible and unenforceable because the City's undeniable primary

motivation was to suppress protected expression.

## Conclusion

The record developed in this case supports judgment on every submitted

Count in Complainant' s Complaint. COUNT I has been established because the

City effected a "Prior Restraint" through its Refusal to Issue the Merchants

License, obviously so it could adopt Ordinance 1244. COUNT II has been

established because the Moratorium is per se unconstitutional and a clear First

Amendment Violation. COUNT III has been established because a basic look at

the City's conduct, before, and even *after* this Court's Order shows a complete lack

of Procedural Safeguards. COUNT IV has been established because the timing of

the adoption of ordinance 1244 clearly shows a "content based" censorial motive.

COUNT V has been established because the record is rife with examples of

unbridled administrative discretion. COUNT VI has been established because a

basic look at the City's conduct manifests a violation of Due Process Rights).

Finally, COUNT VII has been established because a basic look at the City's

conduct shows a violation of Complainant's Equal Protection Rights. Based on the

foregoing, the Complainant has shown that it meets all the criteria set forth to

justify the issuance of a declaratory judgment on all issues presented.

Accordingly,

**IT IS HEREBY ORDERED** that Respondent shall issue Complainant it's

business license applied for in November of 2010, allow Respondent to obtain

building permits to complete build out of it's store's interior and open and operate

the entire store, connect water and sewer service to Respondent's 8600 Daniel

Dunklin Drive facility, issue permit for signage comparable to other businesses in

- 48 -

the area, and to dismiss at its costs all citations issued to Complainant for operating without a business and/or sign license.

**IT IS FURTHER ORDERED** that Respondent is enjoined from further prosecution of Complainant based upon its operation of business to date or otherwise based upon Ordinance #1244

**IT IS FURTHER ORDERED** that Respondent's Complaint for Injunction is denied.

**IT IS FURTHER ORDERED** that the parties shall submit a new Joint Scheduling Plan with regard to Complainant's prayers for attorney's fees and damages within the next 30 days.

Dated this 21st day of December, 2012.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE